# United States Court of Federal Claims

No. 13-515 C
(13-541 C consolidated)
(Filed Under Seal:  March 21, 2014)
(Reissued:  April 8, 2014)[*]

_____

**WHR GROUP, INC.,**

        *Plaintiff,*

**and**

**FRANCONIA REAL ESTATE SERVICES
d/b/a Allegiance Relocation Services,**

        *Plaintiff-Intervenor,*

**LEXICON GOVERNMENT SERVICES, LLC,**

        *Plaintiff-Intervenor,*

**v.**

**UNITED STATES OF AMERICA,**

        *Defendant,*

**and**

**BROOKFIELD RELOCATION, INC.,**

        *Defendant-Intervenor,*

**CAPITAL RELOCATION SERVICES LLC,**

        *Defendant-Intervenor,*

**TRC GLOBAL SOLUTIONS, INC.,**

        *Defendant-Intervenor.*
_____

Bid protest; Judgment on
the administrative record;
Standards for corrective
action; Injunctive relief;
Permanent injunction

---

[*] This opinion originally was issued under seal on March 21, 2014.  The court afforded the parties an opportunity to propose redactions in the opinion prior to its reissue.  Herewith is the reissued opinion with redactions incorporated.

*David T. Ralston, Jr.*, Foley & Lardner LLP, Washington, DC, for plaintiff.

*Thomas L. McGovern, III*, Hogan Lovells US LLP, Washington, DC, for plaintiff-intervenor Franconia Real Estate Services d/b/a/ Allegiance Relocation Services.

*William F. Savarino*, Cohen Mohr LLP, Washington, DC, for plaintiff-intervenor Lexicon Government Services, LLC.

*Devin A. Wolak*, United States Department of Justice, Washington, DC, for defendant.

*Seamus Curley*, DLA Piper US LLP, Washington, DC, for defendant-intervenor Brookfield Relocation Inc.

*Daniel B. Abrahams*, Brown Rudnick, Washington, DC, for defendant-intervenors Capital Relocation Services LLC and TRC Global Solutions, Inc.

## OPINION *and* ORDER

**Block,** *Judge.*

Plaintiffs WHR Group, Inc. ("WHR") and Lexicon Government Services, LLC ("Lexicon") provide services designed to assist government agencies with personnel relocation. Plaintiffs, as well as plaintiff-intervenor Franconia Real Estate Services ("Allegiance"), were awarded agreements to provide these services to the Federal Bureau of Investigation ("FBI"), pursuant to a solicitation conducted in January 2013 (the "January solicitation"). Plaintiffs bring this consolidated post-award bid protest,[1] contesting the FBI's decision to cancel those awarded agreements and replace them through a revised solicitation.

This case is procedurally convoluted. Prior to its consolidation, five parties intervened in each of plaintiffs' protests, with two parties siding with the named plaintiff and three on the side of the defendant. Furthermore, during the pendency of this case, defendant-intervenors Brookfield Relocation Inc. ("Brookfield"), Capital Relocation Services LLC ("CapRelo"), and TRC Global Solutions, Inc. ("TRC"), each filed related protests.[2] All in all, the FBI's action in this case gave rise to a total of five bid protests. The resulting morass brings to mind William Faulkner's observation as to why the lawyer loves the complex: "[To] a lawyer, if it ain't complicated it don't matter whether it works or not because if it ain't complicated up enough it ain't right and so even if it works, you don't believe it."[3]

---

[1] The court consolidated WHR's and Lexicon's bid protests in an order issued on August 8, 2013, pursuant to Court of Federal Claims Rule 42(a), because the cases involve common questions of law. *See* ECF Dkt. No. 42 (Fed. Cl. Aug. 8, 2013).

[2] The court dismissed those protests, 13-592 (Brookfield), 13-596 (CapRelo), and 13-597 (TRC), *sua sponte* without prejudice for lack of subject matter jurisdiction on October 4, 2013.

[3] William Faulkner, THE TOWN 296 (1957).

These now hopefully less complicated consolidated cases come before the court on plaintiffs' motions for judgment on the administrative record pursuant to Court of Federal Claims Rule ("RCFC") 52.1(c) and motions for injunctive relief pursuant to RCFC 65.  Plaintiffs seek to permanently enjoin the FBI from cancelling the agreements awarded pursuant to the January solicitation, soliciting another round of proposals for relocation services pursuant to a revised solicitation, and continuing to procure relocation services from the incumbent Brookfield, through extended task orders.

For the reasons stated below, the court will grant plaintiffs' motions for judgment on the administrative record and permanent injunctive relief.  Accordingly, the court will permanently enjoin the FBI from conducting a revised solicitation in order to replace plaintiffs' awarded agreements and further extending or utilizing Brookfield's task order, except to the extent a transition period is necessary.

# I. BACKGROUND

To provide some clarity to the case, thus avoiding being drawn into a black hole of confusion, the court will commence with a chronological narrative of the case's history.  The court will begin with the terms of the FBI's January solicitation for relocation services and the initial set of awards issued pursuant to that solicitation.  Next, the court will discuss the bid protests which lead to the instant case: Brookfield's protest of the initial awards, the FBI's settlement of that protest through award to Brookfield, and CapRelo's and TRC's protests of the award to Brookfield.  The court will then examine the FBI's proposed corrective action and the protest of that action, the basis of the instant case.

## A. The January Solicitation

The FBI is an "intelligence-driven and [] threat-focused national security organization"[4] tasked with defending the United States from terrorist and foreign threats as well as upholding and enforcing domestic criminal laws.  In pursuit of this expansive mission, the FBI maintains a substantial infrastructure, including 56 "divisions," or field offices, and 380 smaller resident agencies, stationed across the United States.[5]  Additionally, the FBI operates more than 60 international offices in U.S. embassies and employs over 13,000 special agents.  The FBI periodically relocates these agents along this large network of offices.  For example, new agents are sometimes assigned to smaller field offices and relocated once the agents have completed training under a veteran special agent.[6]

In order to assist these agents, the FBI contracts with providers of "relocation services." These are services designed to minimize the inconvenience of moving and include home sale services, home marketing services, destination area services, reports, mortgage counseling, property management services, special handling transactions, and move management services. Pl.'s Mot. for Prelim. Inj. at 3.

The FBI currently procures these relocation services through defendant-intervenor Brookfield.  The FBI has retained Brookfield through extensions of Brookfield's task order,

---

[4] http://www.fbi.gov/about-us/quick-facts.

[5] http://www.fbi.gov/contact-us/field.

[6] https://www.fbijobs.gov/114.asp.

which originally expired on September 30, 2012.  AR at 2074.  These extensions are to ensure there is no gap between Brookfield and the next competitively-awarded provider or providers.

On January 22, 2013, the FBI issued a solicitation seeking to award, through competitive bidding, its task orders for relocation services pursuant to what are termed Blanket Purchase Agreements ("BPAs").[7]  The January solicitation contemplated awarding up to four BPAs.  AR at 9.  Offerors were to be evaluated according to: their "ability to meet all the stated FBI technical requirements as delineated in the Technical Requirements Matrix Form," price, and past performance.  AR at 46.  Past performance was to be evaluated on a "pass/fail" basis.  *Id.*  Section M.1 of the January solicitation also provided that "[a]ward of the [BPAs] [would] be made to the responsible quoter/quoters whose quote is technically acceptable, in full compliance [with] all requirements set forth in the quote and [for] the lowest cost."  *Id.*  Put simply, the FBI planned to award anywhere from one to four BPAs to the lowest-priced technically acceptable offeror or offerors.

Three aspects of the solicitation are of particular importance to this case: the so-called 100 percent financial capability requirement, the agency's estimation of its demand for services, and the rotation-system for task order assignment.  As explained below, these provisions are the crux of the FBI's decision to cancel the January solicitation's awards.

The 100 percent financial capability requirement, listed in the Technical Requirement Matrix Form, Item 33, required offerors to check "yes" or "no" to the following:  "[The contractor] [s]hall be capable of and provide supporting documentation to verify ability to financially handle 100% of the anticipated work as reflected in the FBI's past three years of historical information."  AR at 149.  In other words, the 100 percent financial capability requirement mandated that each offeror certify, with supporting documentation, that it had the capacity to handle the entirety of the FBI's relocation service needs.

Notably, the solicitation did not suggest any specific type of supporting documentation to offerors.  AR at 1278.  Nor did the solicitation purport to apply any specified level of review to the supporting documentation offerors chose to provide.  *Id.*

The solicitation also provided a projected demand figure in order to assist offerors with pricing their bids.  AR at 47-48.  In the solicitation's Statement of Work, the FBI estimated that it would require relocation services for approximately 2,000 moves per year.  *Id.*  However, the Statement of Work made clear that this estimate was not binding, expressly providing that "the successful Contractor will be required to perform regardless of the actual experience of the FBI in the future."  *Id.* at 48.

The January solicitation also set forth a plan for distributing task orders among BPA holders if multiple BPAs were awarded.  Specifically, in the event of multiple BPA awards, each BPA holder would be given a "fair opportunity" to receive task orders on a rotating basis.  AR at 11.  Noting that "[t]here may be situations which interrupt the flow in the order rotation," the FBI reserved the right to waive the rotation system on a case-by-case basis.  *Id.*

---

[7] A BPA is "a collection of provisions that may mature into a contract between the government and a supplier if and when a purchase order. . . is entered into by each.  *Crewzers Fire Crew Transp., Inc. v. United States*, 98 Fed. Cl. 71, 77 (2011).  BPAs are properly the subject of bid protest suits.  *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320 (Fed. Cir. 2011).

Also, it is worth mentioning that the January solicitation contained a "pricing matrix." AR at 134-39. The pricing matrix required offerors to name a price for several items, consisting of ranges of home values from $0 to $750,000. *Id.* Thus, offerors were to provide several prices, one for each range, rather than a single price for all relocation services.

## B. The Initial Set of Awards

The FBI received proposals in response to the January solicitation and determined that there were seven offerors that met all of the relevant technical requirements. These seven technically acceptable offerors included all of plaintiffs and intervenors in these cases as well as [redacted]. The total prices offered for each bidder were as follows:

| | |
|---|---|
| Franconia Real Estate Services | $12,165,236.13 |
| Lexicon Government Services, LLC | $12,445,027.86 |
| WHR Group, Inc. | $12,448,228.23 |
| Capital Relocation Services | [redacted] |
| [redacted] | [redacted] |
| Brookfield Relocation, Inc. | [redacted] |
| TRC Global Solutions, Inc. | [redacted] |

AR at 784. On March 15, the FBI awarded BPAs to the three lowest-priced technically acceptable offerors: WHR, Lexicon, and Franconia Real Estate Services, doing business as Allegiance. *Id.* at 787.

In an "Award Rationale" memorandum dated March 14, 2013, the FBI set forth two reasons for awarding only these three BPAs. P.A. 49-51. First, the FBI noted that the price difference between WHR and the fourth lowest-priced technically acceptable offeror, CapRelo, was approximately [redacted]. *Id.* This was significantly larger than the price gap between Allegiance, Lexicon, and WHR, all of whose prices were within less than $300,000 of each other. The FBI therefore determined that the gap between WHR and CapRelo was a "natural price break," and thus a suitable cut-off point for awarding BPAs. *Id.* Second, the FBI determined that awarding a fourth BPA would mean a higher program cost and additional administrative burdens. *Id.* In the FBI's view, these drawbacks would outweigh any advantage gained by awarding fourth BPA. *Id.*

## C. The Brookfield Protest and the Settlement Agreement

A week after the award, on March 22, Brookfield—the sixth lowest-priced technically acceptable offeror—filed a protest with the Government Accountability Office ("GAO"). AR at 982. In its protest, Brookfield contended that the FBI had not appropriately reviewed the mandatory documentation that the awardees had provided in support of their "self-certifications" of compliance with the 100 percent financial capability requirement. *Id.* at 994.

In Brookfield's view, the FBI could not rely on offerors' self-certifications without substantive review of the submitted supporting documentation. *Id.* at 993-98. Brookfield argued that, because the agency had requested supporting documentation, the FBI was required to analyze the documentation and independently determine whether offerors were capable of providing 100 percent of the agency's relocation service needs. *Id.* Brookfield also contended that, insofar as the FBI failed to do this, the agency had improperly waived the 100 percent financial capability requirement. AR at 1268-69.

The FBI disagreed.  In the official statement to the GAO, the contracting officer pointed out that the January solicitation did not state that the FBI would evaluate the supporting documentation.  *Id.* at 1278.  Rather, according to the contracting officer, the FBI requested supporting documentation only "to secure a sense of accountability from the vendors."  *Id.*  For that reason, the FBI reviewed the supporting documentation only for "contradictory statements."  *Id.*

Although the GAO did not reach a formal decision, the GAO did issue an informal "outcome prediction" during a teleconference with the parties on March 23.[8]  The only record of this outcome predication teleconference is a GAO email scheduling the conference call.  AR at 2092.  Thus, the administrative record contains no direct evidence of the GAO attorney's statements.  However, the parties agree that (1) the GAO did not issue a final decision, (2) the essence of the GAO's prediction was that Brookfield's protest would be sustained, and (3) the GAO stated that it would recommend that the FBI examine the supporting documentation to evaluate offerors' financial capability.  D's Res. to Mot. for Prelim. Inj. at 10-11; P's Rep. to Mot. for Prelim. Inj. at 9-10.

Following this "outcome prediction," the FBI entered into a settlement agreement with Brookfield (the "settlement agreement") on June 7.  This agreement included six provisions.  AR at 1813.  First, the FBI pledged to award a fourth BPA to Brookfield.  *Id.*  Second, Brookfield agreed to waive its rights to protest and bid preparation costs that might have been available in GAO.  *Id.*  Third and fourth, the FBI and Brookfield agreed to move to dismiss any protest of the FBI's decision to award Brookfield's BPA.  *Id.*  Fifth, the FBI represented that, if dismissal was denied, the agency's "present intent" was to eliminate the 100 percent financial capability requirement and allow offerors to submit revised bids.  *Id.*  Sixth, Brookfield reserved its right to contest the initial round of awards to WHR, Lexicon, and Allegiance.

In light of the settlement agreement, the GAO dismissed Brookfield's protest as "academic."  *Id.* at 1860.  But the settlement agreement and the GAO dismissal would not be the final word on the matter.  The agreement and the decision to award a fourth BPA to Brookfield set in motion a slew of events leading to the instant action, beginning with additional protests.

**D. The CapRelo and TRC Protests**

On June 17, the fourth lowest-priced technically acceptable offeror, CapRelo, filed a GAO protest challenging the FBI's award to Brookfield, issued in accordance with Brookfield's June 7 settlement agreement.  AR at 1983.  CapRelo argued that if a fourth BPA were awarded, it should be awarded to the next-most competitively-priced bidder, instead of the sixth lowest-priced technically acceptable offeror - Brookfield.  *Id.* at 1983-84.

On June 24, TRC filed the second protest challenging Brookfield's award.  AR at 2026-2028.  TRC, the seventh lowest-priced technically acceptable offeror, similarly alleged that the FBI's award to Brookfield was improper because Brookfield "was not next in line."  *Id.* at 2027.  Despite the fact that the CapRelo and TRC protests challenged only the award to Brookfield, the FBI issued a stop work order to all four BPA-holders, including Allegiance, Lexicon, and WHR.  AR at 1994.

---

[8]An outcome prediction is a "flexible" alternative dispute resolution procedure wherein "GAO will advise the parties of the likely outcome of the protest in order to allow the party likely to be unsuccessful to take appropriate action to resolve the protest without a written decision." http://www.gao.gov/decisions/bidpro/bid/timetable.html.

In keeping with the terms of the settlement agreement, the FBI and Brookfield moved to dismiss the CapRelo protest on June 26.  AR at 2031-33; 2034-43.  That same day, the FBI independently moved to dismiss the TRC protest.  AR at 2051-53.  The GAO dismissed TRC's protest on the ground that TRC was not an interested party because, as the seventh lowest-priced technically acceptable offeror, it was not in line to receive the fourth BPA.  AR at 2065-66. However, the GAO declined to dismiss the CapRelo protest, finding CapRelo was a sufficiently interested party.  AR at 2049.

## E. FBI's "Corrective Action"

On July 12, once GAO declined to dismiss CapRelo's protest, the FBI announced that it would take "corrective action," as the agency represented it would in the settlement agreement. On July 16, the FBI stated, in an email to the BPA awardees, that it intended to cancel all four BPAs in the first of two internal memoranda dubbed "note[s] to file."  AR at 2067, 2068.  These two documents, issued on July 16 and July 24 respectively, memorialize the basis for the FBI's decision to cancel the four awarded BPAs and restart the solicitation's bidding process.

### 1. The July 16 Note to File

According to the first of these memoranda, the July 16 note to file, the FBI made the decision to take corrective action "to resolve the CapRelo protest."  AR at 2068-9.  This proposed corrective action "entail[ed] cancelling the Brookfield BPA."  *Id.* at 2068.  In the next sentence, the note explains that the plaintiffs' awards were also to be cancelled "[p]ursuant to the BPA terms and conditions."  *Id.*

The July 16 note also states that, upon cancellation of the BPAs, the FBI planned to conduct the procurement anew and "utiliz[e] this opportunity" to revise certain provisions in the solicitation.  *Id.*  Specifically, the note states that the FBI planned to eliminate the 100 percent financial capability requirement, reduce the estimated number of relocations in light of "sequestration cutbacks," and revise the ordering process by eliminating the rotation system.  *Id.*

Furthermore, as explained in the July 16 note to file, the FBI rejected at least two alternatives to cancelling all four BPAs and conducting a new procurement.  *Id.*  First, the FBI declined to follow the GAO's informal recommendation and examine the supporting documentation offerors submitted with their bids to evaluate their financial capability.  *Id.*  The FBI rejected this option because the supporting documentation was "insufficient for evaluation" and the FBI had no standard in place by which to conduct such an evaluation.  *Id.*

Second, and more importantly, the FBI decided against cancelling only Brookfield's BPA, opting to also cancel the three BPAs awarded to WHR, Lexicon, and Allegiance.  *Id.*  The FBI rejected this option because the agency believed it would almost certainly cause Brookfield to renew its protest, "further prolong[ing] the protest timeframe."  *Id.*  However, the FBI acknowledged that cancelling all four BPAs might "attract protests from the three current BPA holders."  *Id* at 2069.  The agency did not further clarify this point, concluding that cancelling all four BPAs was "in the best interests of the government."  *Id.*

### 2. The July 24 Note to File

The week following the July 16 note to file brought several significant developments.  On July 17, the GAO dismissed the CapRelo protest as academic, once notified of the FBI's July 16 note to file.  AR at 2072-73.  On the very next day, July 18, WHR filed notice in this court that it

intended to file the instant bid protest.  Almost a week after notice of this protest was filed, on July 24, the FBI created its second note to file.  AR at 2074-79.

In the July 24 note to file, the FBI set forth a different justification for its corrective action.  Whereas the July 16 note to file states that the FBI's decision to cancel the four awarded BPAs was justified as a means of addressing the CapRelo protest, the July 24 note to file reframes the agency's rationales.  *Id.*  The July 24 note to file cites flaws in the January solicitation as the basis for the FBI's decision to cancel the three BPAs awarded to Allegiance, Lexicon, and WHR.  *Id.* at 2074, 2076.  Indeed, the bulk of the July 24 note to file explains the needed revisions to address the solicitation's issues in detail.  *Id.* at 2074-76.

First, the FBI discussed the need to revise the solicitation's cost and relocation estimates in light of "new information."  *Id.* at 2074.  Specifically, the FBI alleged that it had learned that there would be a probable 40 percent reduction in relocation needs in the coming fiscal year.  *Id.*  According to the FBI, changing the solicitation to reflect this reduction was necessary in order to enable offerors to revise their pricing "in a fair manner."  *Id.*

Second, the FBI set forth a justification for its decision to drop the solicitation's requirement that task orders be distributed on a rotating basis.  *Id.* at 2075.  The FBI explained that it had recently discovered that rotating task orders among BPA-holders would violate Federal Acquisition Regulation ("FAR") 8.405-3(c)(2)(iii).  *Id.*; 48 C.F.R. 8.405-3(c)(2)(iii).  FAR 8.405-3(c)(2)(iii) governs task orders above an amount termed the "simplified acquisition threshold," set by statute at $150,000.  48 C.F.R. 2.101.  The provision states that when an order exceeds the simplified acquisition threshold, all BPA-holders must be afforded the opportunity to submit a quote and the procuring agency must "fairly consider" all of these quotes and make an award.  48 C.F.R. 8.405-3(c)(2)(iii).  In other words, orders above the simplified acquisition threshold cannot simply be rotated among BPA-holders—they must be distributed through competition.  In the FBI's view, this could only be accomplished by revising the solicitation to reflect FAR 8.405-3(c)(2)(iii).  AR at 2075.

Third, the FBI addressed the 100 percent financial capability requirement.  *Id.*  As mentioned above, the January solicitation required that offerors certify that they were financially capable of handling 100 percent of the FBI's relocation service needs.  The agency explained that this requirement was a relic of the housing market downturn and that it was no longer necessary to ensure adequate competition.  *Id.*  The FBI further explained that eliminating the requirement would allow offerors to revise their pricing.  *Id.*

Fourth, the FBI stated that it would change the pricing methodology.  *Id.* at 2076.  As explained above, the January solicitation required offerors to submit fees for multiple home value brackets ranging from $0 to $750,000.  In the revised solicitation, offerors would submit a single fee quote based on average home cost during the most recent fiscal year.  *Id.*  This would create the "tangential benefit of mitigating [the] exposed pricing" of Allegiance, Lexicon, and WHR "because the prior evaluated prices should not correlate to the new pricing scheme."  *Id.*

Finally, the FBI also explained its basis for continuing to procure relocation services from Brookfield under the extended task order, pending completion of a new procurement pursuant to a revised solicitation.  *Id.*  In the agency's view, the transition costs necessary to install a new vendor or vendors exceeded any potential savings.  *Id.*

**F. The Instant Protests**

On July 26, WHR filed its complaint in this court.  On August 5, Lexicon filed its complaint.  Over the ensuing days, this court consolidated these protests and granted the respective motions to intervene of Brookfield, Allegiance, CapRelo, and TRC.[9]

WHR and Lexicon each filed for a preliminary injunction on August 5.  On August 6, the FBI issued a revised solicitation.  The revised solicitation requested offerors submit their bids by August 13.  WHR moved for a temporary restraining order ("TRO") on August 7, enjoining the FBI from cancelling the BPAs, proceeding with the new procurement, and making a new award or awards.  On August 12, the court granted the motion in part and denied it in part.  Because the FBI represented that it would not formally cancel the BPAs until the court had the necessary time to rule on the motions for a preliminary injunction, it was unnecessary to restrain the FBI from cancelling the BPAs.  However, the court did restrain the FBI from proceeding with the new procurement.[10]

In their motions for a preliminary injunction, WHR and Lexicon sought to enjoin the FBI from taking three actions:  (1) cancelling the awarded BPAs, (2) conducting a new procurement pursuant to the revised Solicitation, and (3) extending the Brookfield task order during the pendency of this litigation.  During oral argument on August 29, the parties agreed that, following submission of further materials on the issue of harm suffered by the respective parties, the court could proceed to determine the propriety of permanent injunctive relief.  O.A. Trs. at 104-109.  Defendant submitted a declaration of the contracting officer on September 17.  *See* ECF Dkt. 103, attachment ("Declaration of Dina Olibah").  Plaintiffs and plaintiff-intervenor filed a joint response on September 20.  That same day, Brookfield filed a declaration of its director of pricing and sales finance.  *See* ECF Dkt. 105, attachment ("Declaration of Brian McEleney").

Having reviewed all the parties' submissions, the court is now prepared to render a decision.  For the reasons stated herein, plaintiffs' motions for judgment on the administrative record and permanent injunctive relief are granted.

# II. DISCUSSION

This court is authorized to hear bid protests such as the ones before the court by The Tucker Act, as amended by the Administrative Disputes Resolution Act ("ADRA"), Pub. L. No. 104–320, § 12, 110 Stat. 3870, 3874–76 (1996).  Specifically, the Tucker Act provides the U.S. Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Before the court are two motions—plaintiffs' motion for a judgment on the administrative record pursuant to Court of Federal Claims Rule ("RCFC") 52.1(c) and motion for

---

[9] Defendant-intervenors Brookfield, CapRelo, and TRC filed protests of their own challenging the award of BPAs to Allegiance, Lexicon, and WHR.  The court dismissed those protests *sua sponte* without prejudice for lack of subject matter jurisdiction.

[10] Defendant has since agreed not to resume the procurement pending the outcome of this case, rendering it unnecessary to consider whether to extend the TRO.

injunctive relief pursuant to RCFC 65. As this court has previously noted, these are discrete considerations. *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520 (2010). If plaintiffs succeed on their motion for judgment on the administrative record and, hence, on the merits, "it does not automatically follow that plaintiff[s'] requested injunction will issue." *Id.* at 531; *See PGBA, LLC v. United States,* 389 F.3d 1219, 1225–26 (2004) (stating that "section 1491(b)(4) only incorporates the standard of review of section 706(2)(A) and therefore does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate."). Accordingly, the court will consider each of these motions in turn and separately.

## A. Motion for Judgment on the Administrative Record

### 1. Standards

A judgment on the administrative record is "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (2005). In contrast to a RCFC 56 motion for summary judgment, "a genuine dispute of material fact does not preclude a judgment on the administrative record." *Sierra Nevada Corp. v. United States*, 107 Fed. Cl. 735, 751 (2012) (citing *Bannum*, 404 F.3d at 1355-56).

The ADRA requires courts to review agency decisions in bid protest cases "pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4). Nonetheless, the Supreme Court has long held that the *de novo* review standard set forth in 5 U.S.C. § 706(2)(F) applies to adjudicatory actions, not informal agency decisions. *See MORI Associates, Inc. v. United States*, 102 Fed. Cl. 503, 518 (2011) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)). Rather, the court is limited to considering whether the agency's action in this case was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Bannum, Inc.,* 404 F.3d at 1351.

To make this determination, the court must decide if "(1) the procurement official's decision lacked a rational basis," as well as whether "(2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1358 (Fed.Cir. 2009) (internal citations omitted). To succeed on the first ground, the protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion"; to succeed on the second ground, the protestor must show that there was a "clear and prejudicial violation of applicable statutes or regulations." *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 385 (2012) (quoting *Banknote of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004)).

Concordantly, in considering the propriety of an agency's corrective action, the court must consider whether the agency's decision was "reasonable under the circumstances." *Sheridan Corp. v. United States*, 95 Fed. Cl. 141, 151 (2010); *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999). An agency action cannot meet this bar unless it examined the relevant data and articulated a coherent and reasonable explanation for their decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d 1324, 1333 (Fed. Cir. 2009). Indeed, "[i]t is an axiom of administrative law that an agency's explanation of the basis for its decision must include a 'rational connection between the facts found and the choice made.'" *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal citations omitted). Nonetheless, "it is well established that procurement officials are entitled to a strong presumption of regularity and good faith," which can only be overcome by "clear and convincing evidence" to the contrary. *Linc*

*Gov't Serv., LLC v. United States*, 96 Fed. Cl. 672, 720 (2010) (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-41 (Fed. Cir. 2002)); *see also Withrow v. Larkin*, 421 U.S. 35, 55 (1975).

These standards have been applied in several decisions by this court that delineate the limits of agency discretion within the context of a corrective action.

In *Sheridan Corp v. United States ("Sheridan II")*, 95 Fed. Cl. 141 (2010), the plaintiff successfully challenged the decision of the United States Property and Fiscal Office of Maine, National Guard Bureau, to take "corrective action," suspending an awarded contract and soliciting revised proposals in a procurement for construction of an aircraft maintenance hangar. The agency had taken this corrective action in response to a protest filed in the GAO by an unsuccessful offeror. That protest alleged that the agency had made an evaluation error, incorrectly excluding the protestor from the competitive range. This court sustained plaintiff's protest on the ground that the authority to take "corrective action" does not include authority "to resolicit proposals because of a perceived evaluation error." *Id.* at 153. The court explained that, in light of the APA standards, "corrective action must target the identified defect." *Id.* Because "the agency's concern related to the evaluation of the proposals," the corrective action, if any, "should have been targeted to that issue." *Id.* In other words, the *Sheridan II* court determined that the agency's decision to take corrective action did not satisfy the reasonable under the circumstances standard because conducting the solicitation anew "had no relation" to the identified defect in the procurement – an error in the evaluation of proposals. *Id.* at 154.

Similarly, in *MCII Generator & Elec., Inc. v. United States*, 2002 WL 32126244 (Fed. Cl. Mar. 18, 2002), this court set aside the decision of the United States Army ("Army") to cancel plaintiff's contract award and conduct a revised solicitation due to the Army's failure to identify a clear defect in the solicitation. There, the United States Army ("Army") awarded the plaintiff a contract for the procurement of tactical quiet power generators. A competing offeror challenged the evaluation of proposals in the GAO, arguing that the Army's evaluation of offers was flawed. Specifically, the protestor alleged that the Army's evaluation the past performance factor and application of the solicitation's pricing matrix were in error. The Army responded by announcing it would reopen competition, solicit new proposals under a revised solicitation, and conduct the procurement anew. Plaintiff protested the Army's "corrective action" in this court. Noting that a "corrective action" must be "rationally related to the defect that is identified," *id.* at *1, the court set aside the agency's decision to take corrective action. The court found that the record did not show that the Army had clearly identified a defect and that the court's "speculation" as to what the defect might be was "not enough to save the decision." *Id.* Further, assuming that the defect was in the evaluation of proposals, the court held that soliciting new proposals was not rationally related to such a defect, stating that "re-evaluation is not the same thing as re-solicitation." *Id.* at *2.

These cases are discussed in depth in *Sierra Nevada v. United States*, 107 Fed. Cl. 735 (2012) ("*Sierra Nevada*"). The *Sierra Nevada* case is a post-award bid protest involving a corrective action taken by the United States Air Force ("Air Force"). In *Sierra Nevada*, the Air Force decided that corrective action was necessary because the administrative record was incomplete and evidence of bias on the part of a program manager had tainted the procurement. The court upheld the Air Force's decision to cancel the protestor's award and conduct a revised solicitation for the twenty fixed-wing aircraft at issue.

The *Sierra Nevada* court distinguished *Sheridan II*, citing the fact that "[w]hile the award in *Sheridan* was made on the basis of evaluation of initial proposals only, the award in this case was made after extensive post-proposal discussions between the Air Force and the offerors." *Id.* at 755. Indeed, the court noted that while both *Sheridan II* and *MCII* applied the rationally related targeting test in a context where bids were resolicited when reevaluation to correct faulty evaluations were what was called for, that test "should not be exported to [] more nuanced" circumstances, such as those present in its case. *Id.* at 751. In other words, the court opined that the enunciated targeting test was not absolute. That being so, "[t]he Court of Federal Claims has more or less settled on a standard for review of challenges to corrective actions. It must be reasonable under the circumstances." *Id.*

Accordingly, there can be no "logical talisman [that] can solve" a case. *Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 596 (1940) (Justice Frankfurter commenting on the balance between personal liberty and government), overruled on other grounds by *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943). No single factor can be transmuted into a magical golden "talisman for assessing whether the corrective action was reasonable in the circumstances." *Sierra Nevada*, 107 Fed. Cl. at 751. For that reason, there can be no universal test as to what constitutes appropriate corrective action. To be sure, reasons unrelated to a defect in a solicitation, the obvious ones being legislative reduction of a program or legitimate budgetary needs, could be grounds for corrective action. *See. e.g., First Enter. v. United States*, 61 Fed. Cl. 109 (Fed. Cl. 2004) (holding solicitations can be properly cancelled for budgetary reasons); *Santa Barbara Applied Research, Inc. v. United States*, 98 Fed. Cl. 536, 537-39 (2011) (upholding the Air Force's corrective action in response to budgetary cutbacks imposed by OMB).

## 2. Analysis

In this case, the FBI has decided to take drastic "corrective action," cancelling and replacing four agreements awarded pursuant to the agency's January solicitation for relocation services. The agency intends to conduct a new procurement for these services pursuant to a revised solicitation. As further explained below, the agency contends that this action is justified primarily because the January solicitation is defective and those defects provide a rational basis for their decision to amend to solicitation.[11]

---

[11] Plaintiff Lexicon, in addition to arguing that the corrective action violates APA standards, also argues that it violates the implied covenant of good faith and fair dealing. Lexicon bases this claim on an implied contract theory, whereby "'[T]he issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing.'" Lexicon's Mot. for Prelim. Inj. at 23 (quoting *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004)). It is true that this court once exercised jurisdiction in bid protests pursuant to 28 U.S.C. § 1491(a) under an implied contract theory. But jurisdiction in procurement-related matters is now founded on 28 U.S.C. § 1491(b), which authorizes the court to review agency procurement decisions under the standards set forth in the APA. As the Federal Circuit recently explained, "Congress intended the 1491(b)(1) jurisdiction to be *exclusive* where 1491(b)(1) provided a remedy (*in procurement cases*)." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1246 (Fed. Cir. 2010) (emphases added). Thus, Lexicon's challenge to the FBI's procurement decision must be reviewed exclusively under APA standards and not under an implied contract theory. To the extent Lexicon requests relief based on the implied covenant of good faith and fair dealing, the court *sua sponte* dismisses its claim for lack of subject matter jurisdiction.

This court is tasked with determining if the agency's decision to take this "corrective action" was reasonable under the circumstances and, consequently, must examine the issues the FBI has identified with the January solicitation to determine if the agency has articulated a rational basis for its decision.  The FBI lists the following reasons for their decision: (1) resolving the CapRelo bid protest, (2) removing the 100% financial capability requirement, (3) evaluation errors regarding the 100% financial capability requirement, (4) the task order distribution system's potential to conflict with the FAR, and (5) the FBI's revised projected requirements.  The court will address each of these rationales in turn.

*a. The CapRelo Protest Does Not Provide a Rational Basis for FBI's Decision To Take the Instant Corrective Action*

The FBI contracting officer states in the July 16 note to file that the basis for the agency's decision to take corrective action was "to resolve the CapRelo protest."  AR at 2068.  In context, the note states that:

> The FBI has decided to take corrective action to resolve the CapRelo protest.  The corrective action entails cancelling the Brookfield BPA.  Additionally, the FBI plans on cancelling the three remaining BPA holders, Allegiance, Lexicon, and WHR.  Pursuant to the BPA terms and conditions. . . .

*Id.*  The problem with this rationale is that the gravamen of CapRelo's protest, which contested only the BPA awarded to Brookfield under the settlement agreement, was that "the fourth award rightfully should have gone to the fourth-lowest-priced technically acceptable offeror, [CapRelo]."  AR at 1983.  The protest notes that CapRelo "had no reason to protest" the first three BPAs, awarded to WHR, Lexicon, and Allegiance, because "[t]he FBI was not obligated to award four BPAs."  *Id.*  The primary relief sought by CapRelo was "the terminat[ion] [of] Brookfield's award."  *Id.*

Because the CapRelo protest plainly did not implicate the first three awards, made to WHR, Lexicon, and Allegiance, it cannot provide a rational basis for the FBI's decision to terminate those awards.

*b. Removal of the 100% Financial Capability Requirement Cannot Provide a Rational Basis for the Instant Decision*

In the July 16 and July 24 notes to file, the contracting officer found that the January solicitation's requirement that offerors certify their financial capability to provide 100% of the FBI's projected relocation services was no longer needed.  AR at 2068; AR at 2075.  In those memoranda, the contracting officer stated that the requirement was "outdated" because the agency included it in case the FBI selected "a single vendor" and the January solicitation has identified "adequate competition to satisfy the program."  AR at 2068.  The contracting officer further commented that the requirement "was originally included as a response to circumstances created by the housing market downturn" and, thus, "is no longer a concern."  AR at 2075.  The contracting officer concluded that, in removing the requirement, "the underlying pricing assumption will be effected [sic]" and this "necessitates revised pricing."  *Id.*

Nevertheless, the contracting officer's bald assertions in the notes to file will not suffice because the agency failed to examine the relevant data and articulate a coherent and reasonable explanation for their decision.  *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43; *Impresa Construzioni,*

238 F.3d at 1333.   The administrative record is bereft of any findings or other evidence to support or explain the agency's conclusory *ipse dixit*s.

Although defendant argues, in brief, that removal of the financial capability requirement benefits the agency by "lowering barriers to entry," thus yielding "more competitive pricing," this rationale is not stated in the administrative record.  D's Res. to Mot. for Prelim. Inj. at 32.  Moreover, the contracting officer did not make any finding regarding the likelihood or number of potential new offerors participating in the revised solicitation.   AR at 2068; AR at 2075.  Notably, this solicitation was limited to General Services Administration Schedule 48, Transportation, Delivery, and Relocation Solutions vendors.[12]  AR at 48.  There is no evidence in the record that the agency determined new offerors would emerge from this relatively narrow pool of eligible offerors.

The record is also completely devoid of any evidence showing the agency determined that a revised solicitation would produce cost savings in the form of lower bids.  As plaintiff WHR noted at oral argument, "nowhere in the administrative record is there an indication that [the January solicitation's participants] would have bid differently" if the requirement were not included.  O.A. Trn. at 13.  The contracting officer merely found that "revised pricing" was needed, not that a pricing revision would result in savings to the FBI.  AR at 2075.  This naked conclusion does not supply a rational basis for the instant decision.  *See, e.g., Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983) (holding that the agency decision must be supported by evidence in the record and that the court "may not supply a reasoned basis for the agency's action that the agency itself has not given" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Accordingly, the FBI's action in this case was not "reasonable under the circumstances." *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999).  The dearth of any findings regarding the impact of this decision and explanation of the agency's reasons for the removing the requirement is fatal to the agency's assertion that removal provides a rational basis for the instant decision.  Even given the "strong presumption of regularity and good faith" afforded the decisions of federal agencies, removal of the 100% financial capability requirement cannot sustain the FBI's decision.  *Am-Pro Protective Agency,* 281 F.3d 1239-41.

*c. Alleged Evaluation Flaws Cannot Provide a Rational Basis for the FBI's Decision*

The FBI also avers that its failure to review the documents supporting the offerors' certifications regarding the 100% financial capability requirement for more than facial inconsistencies provides a basis for adopting the chosen course of corrective action.  AR at 984-1135; D's Resp. to WHR's Mot. for Prelim. Inj. at 26-27.  Although the FBI originally defended its evaluation in the Brookfield litigation before the GAO, it now, after "eventually seeing the merit" to Brookfield's argument, contends that the evaluation provides a basis for cancelling the three BPAs and redrafting the solicitation.  D's Resp. to WHR's Mot. for Prelim. Inj. at 26-27.

The court finds that the purported inadequacy of the FBI's evaluation of the documents does not provide a rational basis for the instant decision.  The FBI contracting officer's response to the Brookfield protest furnishes the record with ample reasons, in the agency's own words, as to why this alleged flaw cannot provide such a basis.

---

[12] The General Services Administration lists 19 registered Schedule 48, category 653 7 "Move Management Services" contractors, other than the offerors in this case.  (Available online at: http://www.gsaelibrary.gsa.gov/ElibMain/SinDetails?executeQuery=YES&scheduleNumber=48 &flag=&filter=&specialItemNumber=653+7).

The contracting officer stated that agency evaluators were "instructed not to evaluate the quality of the requested [supporting] documents." AR at 1278. In lieu of a more in depth review, evaluators were "to verify if the supporting documentation included any explicit contradictory commentary that would have stated an inability to meet the requirement." *Id.* The contracting officer stated the agency intended to take offerors "at their word" and supporting documentation was requested merely to "formalize the process." *Id.*

The contracting officer's rationale for this approach is also clear. In the contracting officer's view, "[s]elf-certification was the only means to hold a vendor accountable for their statement of capability." AR at 1281. The contracting officer had been advised by the FBI's internal auditing staff that the only alternative to self-certification was a "full blown audit" of each offeror. *Id.* at 1282. Finding a full blown audit to be impractical, the contracting officer determined self-certification was preferable to no certification.

The contracting officer's response also noted that during the solicitation's question and answer period, offerors asked the FBI if there were required or preferred supporting documents. The FBI responded that "[s]elf certification is at the respondent's discretion." *Id.* at 1282. While this agency response may be "inartful," as the parties remarked at oral argument, it is clear that the agency intended to afford offerors a wide leeway in selecting what constituted appropriate supporting documentation. O.A. Trn. at 51-53; 71-72. The contracting officer also pointed out that the solicitation's evaluation criteria "did not state that the FBI would evaluate the individual documents." AR at 1278.

The record in this case reflects a clear and reasonable rationale for the FBI's evaluation of the 100% financial responsibility requirement. The FBI faced the choice of either relying on offerors' self-certifications or conducting a full financial audit of each firm. It was well within the FBI's broad discretion to choose self-certification. It is also within the agency's broad discretion to decide upon the appropriate level of review. The agency's decision to evaluate offerors' supporting documentation for facial inconsistency instead of a more comprehensive review was buttressed by the sound reason that the agency sought to avoid increased administrative costs and delays. Given this greater context of the alternatives available to the FBI, the agency's decision to facially review the documents for inconsistencies was not arbitrary or capricious.

Even assuming, *arguendo*, that the requirement's evaluation was a defect in the January procurement, the FBI's proposed corrective action would still fail the *Sheridan II* and *MCII* targeting tests. Both of those cases stand for the proposition that, generally, corrective actions regarding flaws in the evaluation process must be targeted at those evaluation issues and cannot consist of wholesale resolicitation. Here, if the FBI's review of the financial capability documents was errant, the agency has the power to further review those documents. This readily available, more narrowly-tailored remedy precludes the alleged evaluation flaw from providing a rational basis for the instant decision. As the *Sheridan II* court stated, the Court of Federal Claims generally "has rejected corrective action to resolicit proposals because of a perceived evaluation error." *Sheridan II* 95 Fed. Cl. at 153 (citing *Delaney Constr. Corp. v. United States*, 56 Fed. Cl. 470 (2003)).

### d. Potential Conflict with the Federal Acquisition Regulations

Defendant also contends that the January solicitation's system of distributing task orders on a rotating basis is a flaw that provides a rational basis for its corrective action, on the ground that this system contravenes the Federal Acquisition Regulations' procedure for orders over

$150,000.  The court finds that this purported issue cannot provide a rational basis for cancelling the agency's corrective action because the solicitation expressly allows the agency to opt out of the rotational system, on a case by case basis.

The solicitation provided that work orders would be assigned to the BPA holders on a rotating basis.  AR at 49.  The FBI intended to treat each employee relocation as a separate task order and assign it to the firm next in the rotation.  AR at 2075.  Notably, the solicitation advised offerors that "there may be situations that occur which interrupt the flow in the order rotation."  AR at 11.  Further, the solicitation stated that "[t]he FBI reserves the right on a case-by-case basis to waive the rotations."  *Id.*  Defendant contends this system has the potential to violate section 8.405-3 of the FAR if task orders exceed a certain monetary limit, referred to as the Simplified Acquisition Threshold ("SAT").  AR at 2075; 48 C.F.R. 8.405-3.

Section 8.405-3 of the FAR mandates that task orders exceeding the SAT, currently set by statute at $150,000, *see* 48 C.F.R. 2.101, undergo another round of competition.  48 C.F.R. 8.405-3(c)(2)(iii)(A)(1).  Agencies are directed to issue a separate request for quote to the pool of BPA holders and invite them to bid for the task order.  *Id.*  Defendant contends this provision cannot be reconciled with the solicitation's rotating task order system and, therefore, is a valid basis for the agency's decision in this case.

It is noteworthy that there is no evidence in the record regarding how often, if at all, the FBI's issue task orders would exceed the SAT, triggering this FAR provision.  Plaintiffs have put forth rough estimates, suggesting that the average relocation will cost roughly $58,500.  O.A. Trs. at 26-28; 45.  As WHR's counsel pointed out, this sum is "less than half" of the SAT.  *Id.* at 27.  However this speculative price estimate does not address the likelihood of outliers over the SAT, a topic the administrative record is silent on.

The FBI contracting officer did not elaborate on the likelihood of this possibility, simply stating that the planned system "did not comply" with the FAR.  AR at 2075.  The contracting officer noted that "the total dollar value of the order may vary on an individual transfer basis."  *Id.*  Consequently, the contracting officer recommended a new approach, stating the agency "believes task orders should be viewed within increments of time."  *Id.*  This methodology would cause all task orders to "exceed the simplified acquisition threshold."  *Id.*

Curiously, the contracting officer suggests solving the potential problem of *some* task orders exceeding the SAT by changing the method for grouping task orders so *all* of them exceed the SAT.  The sole cited reason for this change is that the costs of individual transfers "vary."  *Id.*  There is no explanation as to why variance between the costs of relocations justifies this change in grouping methodology.  Regardless, this court's task is to determine whether the January solicitation's rotational system conflicts with the FAR, not whether the FBI can manufacture a conflict through a change in methodology.

To be sure, the solicitation's rotating task order system has the potential to produce orders over the SAT.  AR at 2075.  It is also clear the FAR requires that orders of this size be competitively awarded instead of simply assigned.  48 C.F.R. 8.405-3(c)(2)(iii)(A)(1).  But this is only problematic if the terms of the solicitation necessitate conflict with the FAR.  This is not the case because the solicitation allows the agency to circumvent the rotation system, when needed, at its discretion.  AR at 11.

Finding no direct conflict between the FAR and the solicitation, even in the uncertain event that a task order exceeds the FAR, this court does not consider the rotational system a sufficient basis to void the January solicitation.

*e. The FBI's Updated Requirement Projection*

The FBI also argues that its projection of a 40 percent reduction in the agency's anticipated number of relocations provides a reasonable basis for corrective action. Def.'s Resp. at 23-24. In the January solicitation's Statement of Work, the FBI observed that it "transfers annually approximately 2,000 employees" and "estimate[d] an annual requirement to relocate 2,000 employees." AR at 9-10, 47-48. But in the July 24 note to file, the contracting officer stated that "FBI budget forecasting has significantly reduced the anticipated scale of the requirement." AR at 2074. The contracting officer noted, "current forecasts anticipate fewer than 900 transfers in Fiscal Year 14 and an overall 40% reduction in anticipated effort/program price." *Id*. The contracting officer concluded that these changes would "likely alter price build-ups." *Id*.

The court finds that this changed projection cannot provide a rational basis for the instant corrective action because it was included in order to assist offerors with pricing, not to guarantee the agency would transact a particular volume of business through the BPAs. Furthermore, both the impact of the sequestration and possibility of decreased volume of business were a known risk to the offerors.

First, the January solicitation explicitly disclaimed responsibility for the solicitation's volume estimate and bound offerors to perform regardless of the agency's actual requirements. AR at 10. The solicitation made clear that information, such as the volume estimate, had been provided "to assist prospective Contractors in examining the FBI's requirements," not to provide a demand quantity. *Id*. It also stated that "successful contractors will be required to perform regardless of the actual experience of the FBI in the future." *Id*. In the Statement of Work, the agency noted that the FBI made "no guarantee, express or implied, that future experience will resemble past experience, either in volume or characteristics," and expressly "required [contractors] to perform regardless" of actual demand. AR at 10, 47-48. This clear statement prevents changed projections from providing a rational basis for the instant decision.

Second, the court notes that knowledge of the then impending budget sequestration—which originally had been set to begin on January 1, 2013, but had been postponed by two months under the American Taxpayer Relief Act of 2012—was widespread in January 2013.[13]

---

[13] The sequestration measure, which was originally passed as part of the Budget Control Act of 2011, was an austerity measure "intended to serve as an incentive for the Joint Select Committee on Deficit Reduction . . . to come to a deal to cut $1.5 trillion over 10 years." Dylan Matthews, *The Sequester: Absolutely Everything You Could Possibly Need To Know, in One FAQ*, WASHINGTON POST, Wonkblog, March 1, 2013, at http://www.washingtonpost.com/blogs/wonkblog/wp/2013/02/20/the-sequester-absolutely-everything-you-could-possibly-need-to-know-in-one-faq/. Although the sequestration cuts—popularly known as the "fiscal cliff"—were set to take effect on January 1, 2013, Congress passed a deal on January 1, 2013, that delayed most of the cuts for another two months. *See* Devin Dwyer et al., *"Fiscal Cliff": Congress Approves Compromise Aimed at Averting Recession*, Jan. 1, 2013, ABC News, available at http://abcnews.go.com/Politics/OTUS/fiscal-cliff-congress-passes-compromise-aimed-averting-recession/story?id=18108091.

Accordingly, the court finds that any prospective bidder would have been on notice of the possibility that the FBI's projected demand might be revised downward.

Plaintiffs and plaintiff-intervenor also point to the historical data supplied by the FBI showing a downward trend in agent relocations.  AR at 146.  They aver that this data gave bidders notice that the volume of business could potentially decrease.  WHR's Mot. for Prelim. Inj. at 20.  In essence, plaintiffs and plaintiff-intervenor argue that the economic climate and the agency's downward demand trends, coupled with the agency's explicit denial of responsibility for the projections, undercuts the argument that revised projections can provide a rational basis for a revised solicitation.

In light of the fact that the possibility of sequestration was common knowledge and that the January solicitation, by its terms, did not commit the FBI to purchasing a specific quantity of relocation services, the court finds that updating the FBI's requirement projections is not, under the circumstances, a reasonable justification for cancelling the three BPAs.

*********

Having addressed each of the stated bases for the instant decision, the court finds that the agency did not have a rational basis, such that its decision to take corrective action was reasonable under the circumstances.  Next, the court turns to plaintiffs' motions for injunctive relief.

## B. Motion for Injunctive Relief

### 1. Standards

The Tucker Act grants this court the power to award "any relief that the court considers proper, including declaratory and injunctive relief" in bid protest cases.  28 U.S.C. § 1491(b)(2).  To decide whether a permanent injunction is warranted, "the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

Consideration of these factors mirrors the "flexible" balancing approach taken in the preliminary injunction context.  *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 513 (Fed. Cir. 1990).  This approach is "rooted in 'equity practice with a background of several hundred years of history,'" *Serco, Inc. v. United States*, 101 Fed. Cl. 717, 721 (2011) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).  No individual factor carries dispositive weight and the court must "weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."  *Standard Havens Products*, 897 F.2d at 513.  Thus, it is not required that the merits of a plaintiff's claims be "absolutely certain, wholly without doubt . . . if the other elements are present (i.e., the balance of hardships tips decidedly toward [the] plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."  *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).  This "sliding scale" approach is thus akin to Judge Learned Hand's formula for determining liability in negligence suits.  *Serco*, 101 Fed. Cl. at 721 (citing *United States v. Carroll Towing*, 159 F.2d 169, 173 (2d Cir. 1947)).

**2. Analysis**

*a. Success on the Merits*

The court finds plaintiffs have succeeded on the merits of their case for the reasons stated above.  Nevertheless, this alone is not sufficient to grant permanent injunction.  *PlanetSpace, Inc.*, 92 Fed. Cl. at 520.  Accordingly, the court turns to the other balancing factors.

*b. Irreparable Harm*

"When assessing irreparable injury, '[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction.'"  *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013) (quoting *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 743 (2000)).

As the court explained in the temporary restraining order issued in this case, plaintiffs will suffer irreparable injury if forced to compete a second time for awards they have already won. *See* ECF Dkt. No. 58 (Fed. Cl. Aug. 12, 2013); *Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 669-70 (2010) ("*Sheridan I*").[14]  In *Sheridan I* a federal government agency awarded the plaintiff a contract to construct an aircraft hangar.  In response to a protest by another offeror challenging the evaluation of proposals, the agency proposed to conduct a new procurement with revised bids.  Although the agency did not formally terminate the plaintiff's contract, it did suspend the plaintiff's performance pending completion of the new procurement.  The plaintiff protested in this court and moved for a preliminary injunction.  This court granted the motion.  The court found that the plaintiff would suffer irreparable harm, in part because it would be faced "with an unnecessary recompetition for the contract it previously won." *Id.*  Because this new competition necessarily put the plaintiff's contract "in jeopardy," the court held that a preliminary injunction was necessary to prevent irreparable harm. *Id.*

In *Sheridan II*, the court granted a permanent injunction, adopting its irreparable harm analysis from *Sheridan I*.  "Unless the agency's corrective action is enjoined," the court explained, "Sheridan faces irreparable harm from an unnecessary recompetition for a contract it has already won." *Sheridan II*, 95 Fed. Cl. at 155.  This was so because "without an injunction, Sheridan may lose the contract and the associated revenues." *Id.*  Moreover, "[e]ven if Sheridan is able to retain the contract following the proposed resolicitation, Sheridan would have been forced to recompete in circumstances where its winning price had already been revealed to the competition." *Id.*

Though not identical, the case here is similar.  Here, as in *Sheridan*, plaintiffs are being forced to compete for awards they have already obtained.  The proposed new procurement will be conducted to replace the existing BPAs.  Because the new procurement effectively puts plaintiffs' awards in jeopardy, it imposes irreparable harm for this reason alone.

Moreover, as in *Sheridan*, the new procurement will harm plaintiffs and plaintiff-intervenor by requiring them to compete after having exposed their pricing in the initial procurement.  Even if the aforementioned changes to the solicitation's pricing system can

---

[14] *See also Sys. Application & Technologies, Inc., v. United States*, 100 Fed. Cl. 687, 720-21 (Fed. Cl. 2011) (stating that irreparable harm is satisfied when a corrective action would cause a protestor to "both lose a valuable contract that it has lawfully won and be forced to expend additional resources to recompete in [unequal] circumstances.").

mitigate the harm, they cannot completely eliminate it.  Allegiance's, Lexicon's, and WHR's exposed pricing exacerbates the irreparable harm another round of competition would cause.

Finally, further extending or utilizing the Brookfield task order would irreparably harm WHR, Allegiance, and Lexicon for the same reason given in *Sheridan I*—it would effectively defeat the validly awarded BPAs.  In short, WHR, Lexicon, and Allegiance have been awarded valid BPAs, and any purported "corrective action" designed to deprive them of the benefits of those BPAs will necessarily work irreparable harm.

In sum, plaintiffs' showing of irreparable harm is enough to satisfy the minimum this court requires.  As the *Sheridan I* court noted, an "unnecessary recompetition" for an award already won constitutes irreparable harm.  *Sheridan I* at 155.

*c. Balance of the Hardships*

In considering the balance of the hardships, this court weighs the irreparable harm plaintiffs would suffer absent an injunction against the harm such an injunction may inflict on defendant and defendant-intervenors.  *See Sheridan I*, 94 Fed. Cl. at 670 (citing *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715-16 (2006)).  In this case, defendant and defendant-intervenors have shown no pertinent hardship to outweigh plaintiffs' and plaintiff-intervenor's irreparable injury.

In her declaration, the contracting officer states that "[t]he FBI will be harmed if it is forced to go without relocation services."  Declaration of Dina Olibah ¶ 6.  Specifically, she explains that the logistics of relocating FBI agents are complicated and that procuring relocation services enables the FBI to avoid "self-moves," whereby the agent being relocated must manage all the logistical burdens.  *Id.*  If unable to procure these services, the FBI "may impede [agents'] arrival [at their new duty stations]" within the 90-day period the FBI requires.  *Id.*  If the FBI were enjoined from conducting a new procurement, the contracting officer declares that would be forced to do one of the following: either (1) obtain relocation services with a BPA directly from a GSA Schedule-holder, (2) extend the Brookfield task order indefinitely even though this would be "improper in any event," or (3) discontinue the relocation services program.  *Id.* ¶ 7.  Moreover, she insists that enjoining the FBI from extending the Brookfield task order would harm the FBI "if this results in a period when we will be without relocation services."  *Id.* ¶ 8.  Here, she notes that the FBI would require a six-week transition period during which Brookfield could be replaced by a follow-on contractor.  *Id.*

The court is not persuaded by this reasoning because an injunction need not require the FBI to go without relocation services for any period of time.  An injunction can be tailored to allow the FBI the needed transition period to replace Brookfield with a follow-on contractor.  Further, the court disagrees with the contracting officer's statement that an injunction prohibiting both a new procurement and another extension of the Brookfield task order would require the FBI to either forgo the BPA vehicle or cancel the relocation services program altogether.  Plaintiffs' BPAs provide a ready alternative to this parade of horribles.

Brookfield advances a different set of hardship arguments.  In his declaration, Brookfield's director of pricing and sales finance restates Brookfield's view that its GAO protest was meritorious and that the BPA awards to WHR, Lexicon, and Allegiance were flawed.  He avers that an injunction would irreparably harm Brookfield because "Brookfield would be deprived of an opportunity to submit a proposal in response to [the revised solicitation] that squarely indicates that offerors need not establish 100 percent financial capability to receive an award."  Declaration of Brian McEleney ¶ 4.

Mr. McEleney's declaration assumes that Brookfield did not have a fair opportunity to compete for the BPAs in the procurement conducted pursuant to the January solicitation. For the reasons explained above, that assumption is false and, thus, this argument fails.

Accordingly, neither defendant nor defendant-intervenors have demonstrated any hardship outweighing the irreparable harm to plaintiffs and plaintiff-intervenor.

*d. Public Interest*

This court's statement in the temporary order with respect to public interest applies here as well:

> [G]iven the unusual chain of events that led to this bid protest, and given what the court has already observed about the likelihood of success on the merits, the court believes that the public interest would be served by granting a [preliminary injunction]. Specifically, the public has an interest in the integrity of the procurement system that is served when government officials are enjoined from taking arbitrary and capricious action. *See CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 576 (2004).

ECF Dkt. No. 58 (Fed. Cl. Aug. 12, 2013).

It is also worth adding as a final point that if the FBI's "corrective action" in this case were not enjoined, it would signify that the government's power to take "corrective action" is nigh unlimited. The requirement that corrective action be "targeted" or "rationally related" to an existing defect in the initial procurement is essential to the integrity of the procurement system. In this case, it is clear that the "corrective action" was not targeted or rationally related to any actual defect and it is therefore crucial to the public interest that the FBI's "corrective action" be enjoined.

**3. The FBI's Extensions of the Brookfield Task Order**

The plaintiffs in this case also petition the court to enjoin the FBI from extending Brookfield's non-competitively awarded task order, task order J-FBI-08-014/A2G0801404, as the FBI has done periodically since the task order's original expiration on September 30, 2012. The plaintiffs aver that these non-competitive extensions are improper because the awardees' BPAs provide the agency with a ready competitively-awarded alternative.

Notably, the agency's decision to extend the Brookfield task order contemplated an interim period "until new BPAs are established." AR at 2076. The FBI contracting officer originally estimated this period would last three months. *Id.* The contracting officer based the decision to extend Brookfield on the "1) operational costs, 2) transition costs & risks, and 3) the integrity of the procurement system." *Id.* It is clear that the contracting officer considered these factors in light of this interim period's expected brevity. The contracting officer noted that "it is evident that the 3 current BPA holders offer lower and more competitive pricing fee structures. However, regardless of whichever task order vehicle chosen (Brookfield or the 3 BPA holders), this would only be used during the short interim period." *Id.* In sum, the administrative record provides rationales for the extension of the Brookfield task order solely until the agency arrived at a more permanent solution.

Because this court is permanently enjoining the FBI from conducting a revised solicitation to replace the January solicitation's awards, there is no basis for further extensions of the Brookfield task order.  Nor is there a basis for utilizing the Brookfield task order as presently extended, except as necessary to accommodate a reasonable transition period in order to install plaintiffs and plaintiff-intervenor.  The Federal Acquisition Regulations and the Competition in Contracting Act set forth specific procedures for, and mandate that federal agencies engage in, competitive acquisition.  41 U.S.C. § 3301; 48 C.F.R. 6.01, 8.405-6.  As discussed above, the FBI is required by law to compete task orders issued pursuant to the Federal Supply Schedule that exceed the Simplified Acquisition Threshold, as the Brookfield task order does.  28 C.F.R. 8.405-2(c)(3)(ii).  Hence, any continued extensions of Brookfield's non-competitive task order or utilization of that task order is unlawful given the option of the plaintiffs' competitively-awarded BPAs.

## III. CONCLUSION

For the foregoing reasons, WHR's CROSS-MOTION for judgment on the administrative record is GRANTED.  Lexicon's CROSS-MOTION for judgment on the administrative record is GRANTED, except insofar as it asserts a claim for breach of the implied covenant of good faith and fair dealing.  Defendant's CROSS-MOTIONS for judgment on the administrative record are DENIED.

Wherefore, the United States and its officers, agents, servants, employees, representatives, and all other persons acting in concert with them with respect to the subject procurement are hereby PERMANENTLY ENJOINED from (1) cancelling the Blanket Purchase Agreements awarded to WHR Group, Inc., Lexicon Government Services, LLC, and Franconia Real Estate Services d/b/a/ Allegiance Relocation Services, (2) conducting a procurement to replace those Blanket Purchase Agreements, (3) extending the Brookfield Relocation, Inc. task order pursuant to which those services are currently procured by the Federal Bureau of Investigation, and (4) procuring relocation services pursuant to the Brookfield task order, except as necessary to accommodate a reasonable transition period to install the plaintiffs as vendors.

Further, the Clerk is hereby directed to take the necessary steps to dismiss the WHR Group, Inc., and the Lexicon Government Services, LLC matters.

**IT IS SO ORDERED.**

*s/ Lawrence, J. Block*

Lawrence J. Block
Judge